**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ROCO, INC. and SONYA L. SMITH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>EOG RESOURCES, INC. (including predecessors and successors),<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 14-1065-JAR-TJJ<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' SUR-REPLY TO CORRECT AND SUPPLEMENT THE RECORD**

**I.   Plaintiffs' Summary Judgment Exhibits Should Be Considered By The Court**

EOG takes issue with some of the exhibits being trial ready and admissible, but that is not the test during summary judgment.

> Materials offered to support or oppose a fact during summary judgment briefing must be capable of being offered at trial in an admissible form. (Generally, this does not mean that the materials themselves must be presented in an admissible form during the summary judgment briefing, only that an admissible form exists by which those facts may be later introduced at trial). A party may object that the opponent has supported a position (either seeking or opposing summary judgment) by material that cannot be presented at trial in a form that would be admissible as evidence.

*Federal Civil Rules Handbook* 2016 at 1180 (numerous citations omitted). EOG's attack on Plaintiffs' summary judgment evidence cites numerous cases, all before the December 1, 2010 effective date of changes to Rule 56(c)(2) and (3). The changes were to prevent the picky procedural issues and lower the cost of having to produce trial-admissible evidence at the summary judgment stage. Thus, EOG's complaints about Plaintiffs' evidence for summary judgment purposes urge the wrong, outdated, legal standard. Dkt. 128 at 11-12.

All of Plaintiffs' evidence will be admissible at trial:

1

Certified copies of the filings and testimony from other cases or proceedings, Exhibits A5-6, A13, A16-19, A25, and A28 can be easily obtained if there is any question about their authenticity. Similarly, testimony given by ONEOK and DCP can be subpoenaed and certified. Regardless of whether considered hearsay, these exhibits would be reliable hearsay upon which experts, such as Dr. Foster and Mr. Reineke, could rely upon for their opinions. *U.S. Fidelity & Guar. Co. v. Sulco, Inc.*, 171 F.R.D. 305, 307 (D. Kan. 1997) (citations omitted). And they would be relevant to show that (a) midstream GCDTP services are necessary to place gas in marketable condition; (b) there is not wellhead or gathering line inlet market for raw gas; and, (c) midstream companies are service providers, not raw gas purchasers.

Exhibit A10, DCP Margin by Contract Type, and A26, subpoenaed gas analysis from DCP, can be easily authenticated by DCP. And, as to A26, EOG can also authenticate the gas analysis it received from DCP.

Exhibit A14, Anadarko Gas Volume Statement for the Cope 17-1 dated January 2009, can be easily authenticated by Anadarko.

Exhibit A15, Excerpt (List of Subsidiaries) from Anadarko Petroleum, Inc. Annual Report dated February 17, 2016, a certified copy can easily be obtained from the Securities and Exchange Commission and offered at trial. Indeed the Court can take judicial notice of such documents. Otherwise, Anadarko can authenticate its list of subsidiaries in its 10-K (if not self-authenticating).

Exhibits A27, 2015 Annual Report and 10-K of ONEOK, can be certified if they are not strictly admissible in digital form as business records. *See* Rule 902(2) & (4); *S.E.C. v. Jasper*, 678 F.3d 1116 (9th Cir. 2012).

Exhibit A9, a white paper prepared by an in-house attorney for ONEOK can be authenticated by the ONEOK attorney [1], ONEOK, or by the publisher.

Exhibit A21, a table of industry papers, can likewise be authenticated based on the websites and 10-Ks, but even if not, they are sufficient for an expert such as Mr. Reineke and Dr. Foster to rely upon them. [2] Notably, EOG did not provide a single website or 10-K suggesting midstream companies purchase raw gas instead of providing gathering and processing services.

---

[1]   Michael L. Pate is still listed as an in-house attorney for Gathering and Processing at ONEOK. http://www.martindale.com/Michael-L-Pate/6354172-lawyer.htm

[2]   In objecting to the evidence of numerous industry websites stating gas is not in marketable condition until after performance of the GCDTP Services based on inadmissible hearsay, EOG cites *Ross v. Rothstein,* 92 F.Supp.3d 1041, 1054 (D. Kan. 2015) which applied a pre-2010 evidentiary standard for summary judgment rather than the post-2010 standard permitting unsworn, unauthenticated documents if those documents could be authenticated at trial. Dkt. No. 128 at 25 of 88; Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" at trial); *see supra.,* this Br. at 1. *Ross* did not exclude consideration of the website and cited only pre-2010 cases for the standard of proof required for summary judgment. *Ross,* 92 F. Supp.3d at 1054. "In the Report, Judge James explicitly addressed the website screen prints, questioning "the authenticity and admissibility of the statements contained" in them. (Doc. 283 at 33 (citing *ColtTech LLC v. JLL Partners, Inc.*, 538 F.Supp.2d 1355, 1357 n. 3 (D.Kan.2008) ("For purposes of summary judgment, the court does not consider unsworn, unauthenticated documents, including printed copies of web sites.")))." *Id*. at 1054. *See also id*. at 1055 (citing two other cases from 2000 and 2006 applying the old summary judgment standard). *See also id*. at 1057-58 (finding that even if the website was admissible, it did not help establish a fact).

As previously stated, the Court can consider unauthenticated documents at summary judgment if the documents could be authenticated at trial. Websites can be authenticated, and it is difficult to imagine that DCP, ONEOK and other Fortune 500 companies that maintain something on their website (and repeat it in 10-Ks) do not sponsor what the website says. Authentication of websites has a three (3) step process:

> To authenticate a printout of a web page, the proponent must offer evidence that: (1) the printout accurately reflects the computer image of the web page as of a specified date; (2) the website where the posting appears is owned or controlled by a particular person or entity; and (3) the authorship of the web posting is reasonably

Exhibit A22, the DCP GG-1s, certified copies can be easily obtained from the Kansas Corporation Commission before trial and offered at trial. Their relevance is showing that midstream company can provide the exact same GCDT services for the commingled gas from various producers irrespective of the type of gas contract to get paid for those same services.

Exhibits A23 and A 24 are relevant to show EOG's business records and data contain the amounts deducted from royalty such that damages, in this case Conservation Fee, can be determined mathematically for Roco and all class members. Of course, they were provided by EOG, through its counsel, so presumably EOG can authenticate them.

EOG even objects to A1, the form of express deduction lease it produced in discovery and that bears its Bates label, as irrelevant to the lawsuit. The lease is relevant under Fed. R. Evid. 401 because it shows that EOG knew how to write a lease that expressly authorized the deductions taken under EOG's contracts with midstream service providers. This fact is of consequence in determining EOG's motion for summary judgment against Roco because Roco's lease contains no

---

attributable to that person or entity. Evidence that may corroborate these points could include testimony of others who saw the posting on the website, continuation of the posting on the website so that it is available to be seen by the court, or evidence that the party to whom the posting is attributed made similar postings or published the same information elsewhere. *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F Supp2d 1146, 1154 (CD Cal 2002) (declarations that printouts were "true and correct" copies of internet pages, "in combination with circumstantial indicia of authenticity (such as the dates and web addresses)" would support reasonable juror belief that documents are what proponent claims); *also see Johnson–Wooldridge v. Wooldridge,* No. 00AP–1073, 2001 WL 838986, at *4 (Ohio App July 26, 2001) (party who printed documents from a website "could have authenticated the documents himself via an affidavit or through his own testimony").

*Estate of Konell v. Allied Property & Casualty Ins. Co.,* No. 3:10-cv-955-ST, 2014 WL 11072219, at *1 (D. Ore. Jan. 28. 2014); *see also Lorraine v. Markel Am. Ins. Co.,* 241 F.R.D. 534 (D. Md. May 4, 2007) (reciting similar authentication factors for evaluating admissibility of website postings and a few more); *Toytrackerz LLC v. Koehler,* No. 08-2297-GLR, 2009 WL 2591329 (D. Kan. Aug. 21, 2009). The requirements for authentication can be met easily as the case proceeds to trial.

such language and EOG nonetheless permitted the same deductions under the gas contract applicable to Roco's lease. *See* Dkt. 126-1, Plant Statement and corresponding check stub to Roco, Inc. (filed under seal). Under this same reasoning, A8 will likewise be admissible and relevant at trial. Plaintiffs maintain EOG breaches the lease and lacks good faith in treating Roco's and the other class members' leases as express deduction leases when those leases lack language expressly authorizing the deduction of the GCDTP services costs from royalty. Moreover, the Express Deduction Lease is an admission against Defendant's interest as it recounts what is necessary (namely, GCDTP) to make case "merchantable" or "marketable"—contrary to Defendant's newly generated position that raw gas already is merchantable or marketable.

Contrary to EOG's assertion, Dkt. 128 at 33-38 of 88, Rex Sharp had personal knowledge of spreadsheets and documents produced to him pursuant to a subpoena and also provided to EOG. Indeed, Mr. Sharp had physical possession of all of the evidence, and provided that evidence to the Court, so he must have had personal knowledge of the evidence.

## II.     *Fawcett*—The Latest

While EOG argues the *Pummill* case—where the same ONEOK Alan Bates and DCP testified to the same thing as here and were rejected factually and legally—is unrelated and irrelevant, EOG seems to think the unrelated *Fawcett* case is relevant, despite the procedural and evidentiary differences. EOG spins *Fawcett* in unimaginable ways, including the remand hearing in the district court on the mandate. To the extent relevant, the latest *Fawcett* pleadings are attached hereto, and the hearing is set for July 22, 2016. *See* Pl. Mot. to Certify Orders, Def. Resp., Pl. Reply and Not. of Hrg, attached as **Exhibits 1-4.** Hopefully, the Kansas Supreme Court will further explore the meaning of the mandate for the Fawcett Class and OPIK and for the district courts grappling with the new issues raised by its opinion.

Judge Melgren recently analyzed *Fawcett*'s meaning for purposes of class certification. Mem. and Order, *Roderick Trust v. XTO Energy, Inc.,* No. 08-1330-EFM-GEB (D. Kan. June 22, 2016) and Mem. and Order, *Roderick Trust v. OXY USA, Inc.,* NO. 12-1215-EFM-GEB (D. Kan. June 22, 2016) (Dkt. Nos. 129-1 and 129-2). Without arguing Judge Melgren's reading of *Fawcett*, it is sufficient to say that he finds *Fawcett* does not permit either party to win as a matter of law, rather marketable condition and good faith are fact issues. *Id.*

### III.    Plaintiff's Expert Opinions Are Admissible

Plaintiffs' experts' testimony is admissible. The Kansas Supreme Court never mentioned the admissibility of experts in *Fawcett* because there were none. Nor did it reverse and render judgment as a matter of law in favor of OPIK (as EOG thinks it should have regardless of the facts). Dr. Foster addressed what constitutes a "market" and that title transfers or conditional sales before the gas is prepared for that market are not good faith sales.[3] *Fawcett* does not preclude any of that. Mr. Reineke addressed marketable condition from his standpoint as a petroleum engineer, gas marketing from his years of experience doing that job and reviewing gas contracts and gas markets, and good faith sales as they relates to the royalty owner (not as they relate to DCP which

---

[3]     Contrary to EOG's complaint, Dkt. 128 at 28 of 88, Dr. Foster's definition of good faith dovetails with Kansas law. *Compare* Foster Dep. 70-71 *with* Good Faith jury instruction based on Kansas law in Plaintiff's Response Brief, Dkt. 123 at 48-49.

EOG argues the UCC for a good faith sale between two merchants. Dkt. 128 at 28 of 88, and *id.* at 74 of 88. But royalty owners are not "merchants" and are not parties to the gas contracts. Good faith (including the mutual benefit rule) must be as to the royalty owners, not the contracting party like DCP or ONEOK as Judge Melgren recognized. Dkt. 129-2 at 12-13 ("determination of the good faith element of marketability and the Trust's claim for breach of the implied duty of good faith and fair dealing are not coterminous. The latter addresses the relationship between the Trust and XTO and prohibits either party to the oil and gas leases from 'purposely do[ing] anything to prevent the other party from carrying out his part of the agreement, or do[ing] anything which will have the effect of destroying, or injuring the right of the other party to receive the fruits of the contract.' Conversely, the good faith element of marketability is a narrower question involving analysis of the transaction between XTO and the purchaser of the gas…") (footnotes omitted).

can protect itself in the gas contract it is a party to). Contrary to EOG's spin, Mr. Reineke does have gas marketing experience from when he was a producer. Dkt. 128 at 26 of 88. He said just the opposite. Reineke Dep. 25:19-23 ("Q. You, yourself, are not an expert in gas marketing, is that fair? A. I have marketed gas for my own account, but as far as aggregating large amounts of gas and marketing gas, I have not done that.") (Dkt. 128-15 at 7 of 58). EOG claims it could not have examined Mr. Reineke about his new opinion on good faith. Dkt. 128 at 27 of 88, n.27. Not true. EOG never even tried, even though it had time for discovery and did do depose Dr. Foster.

The expert opinions are not contrary to *Fawcett*, which does not address *factually* what good faith is, what a "market" entails, or the quality of the gas for marketable condition. [4]

### IV. Oklahoma Facts (and facts from other states) Are Relevant

Contrary to EOG's assertion without evidentiary or legal support, Dkt. 128 at 33 of 88, facts from Oklahoma are relevant in Kansas since there are no physical or economic differences posed by state lines: lease forms are the same, gas is produced the same way, gas analysis done the same way, gas Midstream Services done the same way (even same parties, same form gas contracts, and even commingled Kansas and Oklahoma gas covered under the same contracts and travelling over the exact same gathering and processing facilities), and markets are the same (and often identical for gas from both states).

### V. Plaintiffs Do Not Concede That The Conservation Fee Was Properly Reimbursed

---

[4] Despite the Kansas Supreme Court calling the implied covenant the "Marketable Condition Rule", Judge Melgren did not believe the condition or quality of the gas was important to the question. *See, e.g.,* 129-2 at 13-14 of 17 (noting that gas market sales were more important).
Judge Melgren also found that all of the leases (including types like Plaintiff here) contained the implied Marketable Condition Rule and the duty of good faith and fair dealing. *Id.* at 11. The Court reviewed all of the royalty clause variations XTO identified and concluded none of them "expressly authorized operators to deduct from royalty payments the costs for making the gas marketable." *Id.* at 9-10 of 17.

Plaintiff does not "concede" that EOG has reimbursed Roco as EOG suggests. Dkt. 128 at 62-63, 84-86 of 88. Defendants contend Roco's Conservation Fee Claim is moot because EOG mailed Roco a check offering to reimburse the Kansas Conservation Fees deducted from Roco's royalty from the date the Cope 17-1 well started producing gas to the date EOG sold the well to Palmer Oil. Dkt. 128 at 86. But, Defendant can offer only proof of delivery of the check because Roco, Inc. did not cash it. Dkt. 128-8. [5] *Cambell-Ewald* makes clear an "unaccepted offer cannot moot a case." *Campbell-Ewald Co. v. Gomez,* --- U.S. ----, 136 S.Ct. 663, 670 (Feb. 9, 2016). So it is here, EOG's unaccepted check to Roco, Inc. for the wrongfully deducted Conservation Fees cannot and does not moot the case.

Unlike Chevron's reimbursement of the Kansas Conservation Fee class-wide with its regular royalty payment and no letter or notice of explanation, EOG, which is represented by the same counsel as Chevron, sent Roco a letter explaining the check constituted reimbursement of the wrongfully deducted Conservation Fees. *Compare* Pl. Proposed Sur-reply at 7-10, *Thelma Jean Lambert Living Trust v. Chevron U.S.A., Inc., et al.,* No. 14-CV-01220-JAR-TJJ (Dkt. 120-1) *with* Dkt. 127-7, Letter to Roco, Inc. with check.

---

[5]   Roco, Inc. is named plaintiff and represented by counsel, but received a check along with a letter directly from EOG explaining that the check represented Conservation Fee deductions that EOG took while it produced gas from the well. Roco did not cash the check, choosing instead to seek to pursue the Conservation Fee claims on behalf of the Class so all royalty owners, not just Roco, would receive a refund of the wrongfully deducted Conservation Fees for the entire Class Period. But, because the Class Period in this case extends back to 1993, rather than 2009 as in *Lambert Trust v. Chevron, et al.,* No. 14-CV-01220-JAR-TJJ, the cost to EOG to refund the Conservation Fees to all of the royalty owners in the Class would cost many times what it would cost Chevron. *See* Supp. Decl. of Greg C. Morby in *Chevron*, Dkt. 117-4 at 2, ¶ 7 ("total amount paid, for conservation fees and associated interest, to Kansas royalty owners…was $11,863.56."). Consequently, EOG did not attempt to buy off the Class Conservation Fee claim, only the Class Representative's Conservation Fee claim.

Plaintiffs ask the Court to consider limiting EOG's ability to communicate directly with the royalty owner class members about this litigation. Where, as here, a defendant has an on-going relationship with the members of the putative class, many courts have found it proper to restrict a defendant's communications with putative class members. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) ("a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties."). In applying *Gulf Oil,* one federal district court recently analyzed the problem this way:

> In general, communications that are litigation-neutral-that do not alter the legal relationship between the defendants and members of a putative class-are not subject to restriction. However, courts have a responsibility to restrict communications that are potentially coercive or misleading. *See Gulf Oil,* 42 U.S. at 104 ("We recognize the possibility of abuses in class-action litigation, and agree ... that such abuses may implicate communications with potential class members."); *In re School Asbestos Litigation,* 842 F.2d at 680 ("Misleading communications to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally."). In some circumstances where there is an ongoing and unequal business or employment relationship between the parties, communications may be deemed inherently coercive. ... Furthermore, a communication may be coercive where the defendant interferes with participation by potential class members in the lawsuit or misleads them by failing to reveal how some proposed transaction might affect their rights in the litigation. *See Goody v. Jefferson County,* No. CV–09–437, 2010 WL 3834025, at *3 (D. Idaho Sept. 23, 2010) (requiring corrective notice where defendant's communications with potential class members caused confusion about right to join suit); *In re Currency Conversion Fee Antitrust Litigation,* 361 F.Supp.2d at 254 ("[D]efendants' unsupervised communications were improper because they sought to eliminate putative class members' rights in this litigation.").

*Zamboni v. Pepe W. 48th St. LLC*, No. 12 CIV. 3157 AJN JCF, 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013) (requiring curative notice); *Sloan v. Ameristar Casinos, Inc.*, No. 12-cv-01126-MSK-KMT, 2013 WL 1127062, *2 (D. Colo. 2013) (court found defendants' communications to putative class members "deceitful and designed to thwart proper functioning of this lawsuit" an order limiting defendants' future communications was warranted "to avoid further potential for abuse"); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 669 (E.D. Tex. 2003) (court found defendants'

9

communications "misleading, coercive and an attempt to undermine the purposes of a collective action" and enjoined defendants from future communications about the action with class members). [6] While EOG's conduct is more forthright than Chevron's, neither should have unfettered contact about the issues in this lawsuit with Class members without specific Court approval. Even Class Counsel, after class certification, must ask for approval of the content and mode of delivery of Class Notice to communicate with the Class members. Defendants should adhere to the same.

                        Respectfully submitted,

                        s/ *Rex A. Sharp*
                        Rex A. Sharp KS #12350
                        Barbara C. Frankland KS #14198
                        REX A. SHARP, P.A.
                        5301 W. 75th Street
                        Prairie Village, KS  66208
                        (913) 901-0505
                        (913) 901-0419 fax
                        rsharp@midwest-law.com
                        bfrankland@midwest-law.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

      I hereby certify that, on this 28th day of June, 2016, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to counsel all counsel of record.

                                          s/ *Rex A. Sharp*

---

[6]     Defendant cites *Knox v. Serv. Employees* in which the United States Supreme Court actually denied defendants' motion to dismiss the plaintiff's claim as moot even though defendants offered a full refund to all class members. 132 S.Ct. 2277, 2287. In viewing defendants' "post-certiorari maneuvers" with a "critical eye", the Court concluded a live controversy remained about the adequacy of the refund notice. *Id.* at 2287-88. So it is here, a live controversy remains. The unpublished opinion of *S. Ute Indian Tribe v. La Plata Cnty.*, 61 F.3d 916 (10th Cir. 1995), which Defendant also cites, involves ripeness, not mootness. Defendants also cite Rule 68 settlement offer cases, but Defendants did not offer to allow judgment against them or include costs and attorneys' fees incurred to date. Fed. R. Civ. P. 68. These cases do not apply to the issues before the Court.