## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ROCO, INC. and SONYA SMITH, on behalf of themselves and all others similarly situated,**

**Plaintiffs,**

**v.**

**EOG RESOURCES, INC. (including predecessors and successors),**

**Defendant.**

**Case No. 14-1065-JAR-TJJ**

### MEMORANDUM AND ORDER

Plaintiffs Roco, Inc. and Sonya Smith bring this lawsuit to recover underpaid royalties due on oil and gas wells operated by Defendant EOG Resources, Inc.  Before the Court is Defendant's Motion for Summary Judgment as to Roco and Motion to Dismiss All Kansas Claims (Doc. 69).  In conjunction with this motion, the Court also considers Roco's Motion to Strike Most of the Declaration of Alan Bates as Improper Opinion and Conclusory Testimony (Doc. 131), and Motion to Strike Most of the Declaration of Michael Cobb of DCP Midstream as Improper Opinion and Conclusory Testimony (Doc. 132).  These motions are fully briefed after a period of discovery was provided under Fed. R. Civ. P. 56(d), and the Court is prepared to rule.  As described more fully below, the Court denies Roco's motions to strike and grants in part and denies in part EOG's motion for summary judgment as to Roco.

### I.      Procedural and Factual History

This is a putative class action lawsuit removed to this Court on March 3, 2014, from the District Court of Seward County, Kansas, pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1446(b)(3), 1453(b).  Roco, an alleged royalty owner in one well in Kansas formerly operated by EOG, and Smith, an alleged royalty owner in EOG-operated wells in Oklahoma, claim that

EOG underpaid royalties on the gas wells by improperly taking deductions from royalty payments before the gas products were in marketable condition.  Plaintiffs purport to bring their claims individually, and on behalf of a putative class of all royalty owners in EOG-operated wells in Kansas and Oklahoma from January 1, 1993, to present.

Natural gas must meet certain quality specifications before it can enter an interstate pipeline.  Namely, it must undergo "midstream gathering and processing."  EOG contracts with third parties to perform gathering and processing, and this case deals with how those midstream gathering and processing costs are shared, if at all, between EOG and Roco under the terms of the lease, and the implied duties that attach thereto.  Roco alleges that EOG underpaid royalty owners by taking numerous volumetric and fee-based deductions before the gas products were in marketable condition that were not revealed on the royalty owners' check stubs.  Each gas contract has some type of in-kind fee and some type of monetary fee to pay for the midstream Gathering, Compression, Dehydration, Treatment, and Processing ("GCDTP") services.  Roco alleges that EOG paid royalty on the net, not gross, gas contract value, in breach of the marketable condition rule.  Roco claims that EOG passed these midstream processing costs onto the royalty owners by entering into purported "sales" to third-party purchasers.  Roco claims that these are not true purchases; the actual gas products cannot be sold until they enter the commercial market for the starting price of each gas product.

For these reasons, Roco maintains that EOG breached an implied covenant to place the gas and its constituent parts in "marketable condition" at EOG's exclusive cost, and that EOG breached the implied duty of good faith and fair dealing by entering into gas purchase agreements with third-party purchasers on paper only, thereby hiding the midstream processing costs that were passed on to the royalty owners.  Part of Roco's claim is that EOG improperly

deducted the Kansas Conservation Fee, which the Kansas Supreme Court has held may not be shared with royalty owners.[1]

The parties entered into a phased pretrial management plan; a Phase I Class Action Certification Scheduling Order was entered on April 25, 2014.[2]  This Order, as amended, contemplated class certification discovery completed in July 2016, and the deadline for Plaintiffs to file a class certification motion was set for January 29, 2016.[3]  During this period, the parties exchanged a substantial amount of document discovery.

On October 28, 2015, before Plaintiffs had filed their motion for class certification, EOG moved for summary judgment based on a July 2, 2015 Kansas Supreme Court decision, *Fawcett v. Oil Producers, Inc. of Kansas*.[4]  That case squarely addresses the marketable condition rule as it applies to third-party purchase agreements similar to those EOG entered into in this case. Plaintiffs argued that the summary judgment motion was premature, and that they should not be required to respond until after the class certification motion is decided.  Plaintiffs also sought leave to amend, in order to clarify certain facts, align the breach of lease allegations to the standards set forth in *Fawcett*, and add the claim that EOG improperly passed along the Kansas Conservation Fee to royalty owners.  Magistrate Judge James granted Plaintiffs' motion for leave to amend, excusing its untimeliness in light of the *Fawcett* decision and the relatively early stage of this proposed class action.  Judge James further determined that the motion for summary judgment was not premature; EOG was not precluded by the phased deadlines in this case from filing a dispositive motion.  Both sides acknowledge the import of the *Fawcett* decision on the

---

[1] *Hockett v. Trees Oil Co.*, 251 P.3d 65, 71 (Kan. 2011).

[2] Doc. 26.

[3] *See* Doc. 67.

[4] 352 P.3d 1032 (Kan. 2015).

Kansas claims in this case, and Judge James determined that whether summary judgment is appropriate as to the named Plaintiff under *Fawcett* should be decided before class certification. Judge James granted Roco additional time under Fed. R. Civ. P. 56(d) in order to conduct discovery necessary to oppose the summary judgment motion, setting a May deadline for the response.  Roco had argued that it needed further discovery regarding the terms of EOG's third-party purchase agreements in order to discuss the implied duties implicated by the *Fawcett* decision.  After the reply was filed, Roco sought leave to file a sur-reply, and moved to strike the declarations of Alan Bates and Michael Cobb that were attached to EOG's reply memorandum. The Court allowed Roco leave to file a sur-reply, and granted EOG's motion to file a sur-response.  The parties have also filed notices of supplemental authorities since the briefs were filed.  The Court has reviewed all of these pleadings and supplemental authorities in deciding the instant motions.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[5]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[6]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[7]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]  An issue

---

[5]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[6]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[7]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[8]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[9]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[10]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[11]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[12]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[13]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[15]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge

---

[9]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[10]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[11]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[12]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[13]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[14]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[15]*Adams*, 233 F.3d at 1246.

and shall set forth such facts as would be admissible in evidence.[16]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[17]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[19]

## III.    The *Fawcett* Decision

As already mentioned, the instant motion for summary judgment is based almost entirely on the 2015 *Fawcett* decision by the Kansas Supreme Court.  The parties vehemently dispute the scope of the court's holding in *Fawcett*, and how it applies to the facts of this case.  EOG urges that under *Fawcett*, summary judgment is warranted as a matter of law, whereas Roco contends that *Fawcett* opens the door to genuine factual disputes about good faith.  Both parties filed numerous evidentiary objections and motions to strike the summary judgment evidence.  In order to consider these objections and determine the uncontroverted facts in this matter, the Court must first discuss its understanding of the *Fawcett* decision, and the degree to which it leaves open factual questions that may apply to Roco's breach of lease claim in this case.[20]

---

[16]Fed. R. Civ. P. 56(c)(4).

[17]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[18]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[19]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[20]The breach of lease claim is the only claim brought under Kansas law; Count 2 for breach of fiduciary duty is brought under Oklahoma law and is asserted by Smith only.

*Fawcett* was a class action lawsuit alleging underpayment of royalties claimed under twenty-five oil and gas leases where the lessee-operator sold raw natural gas at the wellhead to third parties that in turn processed the gas before it entered the interstate pipeline system.[21]   The issue before the court was "whether the operator may take into account the deductions and adjustment identified in the third-party purchase agreements when calculating royalties" to the lessors.[22]   To answer this question, the court had to consider the reach of the marketable condition rule, which it characterized as an "off-shoot" or "corollary" to the implied duty to market.   The marketable condition rule requires operators to make gas marketable at their own expense.[23]   The third-party purchase agreements contained a quality requirement allowing the purchaser to refuse delivery or acceptance of the gas with lower treatment costs, if the gas is not in a certain, specified condition.   There was no evidence that costs had been assessed due to failure to adhere to the contracts' quality standards.

The leases at issue in *Fawcett* were "*Waechter* leases" that required the lessee to pay the lessor "one eighth of the proceeds if sold at the well, or, if marketed off the leased premises, then one-eighth of the market value at the well."[24]   The class argued that under the marketable condition rule, the operator must "bear the entire expense of transforming raw natural gas into the quality required for transmission into the interstate pipeline system."[25]   The court rejected this argument, finding that the duty to prepare the gas for market under the marketable condition

---

[21]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1034 (Kan. 2015).

[22]*Id.*

[23]*Id.* at 1034–35.

[24]*Id.* at 1039 (quoting *Waechter v. Amoco Prod. Co.*, 537 P.2d 228, 230 (Kan. 1975)) (accepting the Kansas Court of Appeals' finding that 22 of the 25 leases were *Waechter* leases, and the other three were combination leases that should be deemed *Waechter* leases, findings that were not challenged by the parties).

[25]*Id.*

rule does not require the gas to be at interstate pipeline quality.[26]  The court proceeded to consider the Kansas cases construing the marketable condition rule.[27]  When these cases are taken together, the court concluded they show that "when gas is sold at the well it has been marketed."[28]  Moreover, the court explained that these cases prohibit an operator from deducting pre-sale expenses required to make gas acceptable to third-party purchasers when gas is sold at the well, but "post-sale, post-production expenses to fractionate raw natural gas into its various valuable components or transform it into interstate pipeline quality gas are different than expenses of drilling and equipping the well or delivering the gas to the purchaser."[29]

> We hold that when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses.  In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction.  *See Waechter*, 217 Kan. 489, Syl. ¶ 2, 537 P.2d 228.  OPIK satisfied its duty to market the gas when the gas was sold at the wellhead.  When calculating Fawcett's royalty, the post-production, post-sale processing expenses deducted by the third-party purchasers are shared.
>
> We are sensitive to the potential for claims of mischief given an operator's unilateral control over production and marketing decisions.  But we believe royalty owners' interests are adequately protected by the operator's implied covenant of good faith and fair dealing and the implied duty to market.  The latter demands that operators market the gas on reasonable terms as determined by what an experienced operator of ordinary prudence, having due regard for the interests of both the lessor and lessee, would do under the same or similar circumstances.  *See Smith*, 272 Kan. at 85, 31 P.3d 255; *Robbins*, 246 Kan. at 131, 785 P.2d 1010.  In this case, Fawcett does not challenge OPIK's good faith, its prudence in entering into the purchase agreements at issue, or their material terms.  Accordingly, we need not dwell further on what this might entail.[30]

---

[26]*Id.*

[27]*Id.* at 1040–41 (discussing *Gilmore v. Superior Oil Co.*, 388 P.2d 602 (Kan. 1964); *Schupbach v. Continental Oil Co.*, 394 P.2d 1 (Kan. 1964); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788 (Kan. 1995)).

[28]*Id.* at 1041.

[29]*Id.* at 1041–42.

[30]*Id.* at 1042.

EOG argues that *Fawcett* squarely applies to this case and requires this Court to find that it was not required to take into account any post-sale expenses incurred by third-party purchasers when calculating Roco's royalty.  As such, EOG claims that the marketable condition rule was satisfied when gas was delivered at the wellhead or in the field to third-party purchasers Anadarko Energy Services Company ("AESC") and DCP Midstream L.P. ("DCP") in a condition acceptable to them, in good faith transactions.  Roco argues that *Fawcett*'s holding does not apply here because (1) the gas was not sold at the wellhead; (2) the gas was not marketed at the wellhead; and (3) unlike in *Fawcett*, Roco here challenges EOG's good faith and prudence in entering into the purchase agreements with Anadarko and DCP.  Roco refers to these three arguments as *Fawcett*'s "appellate concessions."  Because these concessions are not made here, Roco argues the Court must deny the motion for summary judgment.

## IV.    Evidentiary Objections

Summary judgment evidence "must be submitted 'in a form that would be admissible at trial."[31]  Under Fed. R. Civ. P. 56(c)(2), a party may object on this basis—that the material "cannot be presented in a form that would be admissible in evidence."  Indeed, as the advisory committee notes to the 2010 Federal Rule amendments explain: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[32]  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[33]

---

[31] *Brown v. Perez*, –F.3d–, No. 15-1023, 2016 WL 4501821, at *4 (10th Cir. Aug. 29, 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[32] Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

[33] *Perez*, 2016 WL 4501821, at *4 (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015)); *see O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

### A.       Hearsay and Authentication

EOG objects that many of Roco's exhibits in opposition to summary judgment are unauthenticated and constitute hearsay, and thus should be excluded.  On summary judgment, affidavits "must contain certain indicia of reliability."[34]  "Information presented in the nonmovant's affidavit must be 'based on personal knowledge and [must set] forth facts that would be admissible in evidence.  We do not consider conclusory and self-serving affidavits.'"[35] With respect to hearsay, Roco must make some showing that the substance of the evidence would be admissible at trial by either demonstrating that an exception applies, or that the declarant would testify to the document's contents.[36]  Roco offers Exhibits 1-28 through the declaration of its counsel, Rex Sharp.[37]  He states at the outset that his statements are "based upon personal knowledge."  The Court overrules and denies objections pertaining to documents that are plainly business records given that they were produced during discovery.  Several of the documents offered through Mr. Sharp, while not admissible in the form presented, are admissible under the business records or public records exceptions to the hearsay rule, and may be authenticated by the custodians of records from EOG, Anadarko, or DCP.  The hearsay and authentication objections to Exhibits 10, 14, 15, 16, 26, 27, and 28 are thus overruled.[38]

The Court agrees with EOG however that certain exhibits must be excluded because Roco, as the proponent of the evidence, has failed to demonstrate that a hearsay exception applies, or that it could otherwise be presented in a form that would be admissible at trial.  First,

---

[34]*Ellis v. J.R's Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015).

[35]*Id.* (quoting *Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002)).

[36]*See Brown*, 2016 WL 4501821, at *4–5.

[37]Doc. 123-2, Ex. A.

[38]This does not mean that Plaintiff's asserted interpretation of these documents, some of which are technical documents, is admissible absent the testimony of a witness with personal or expert knowledge who is qualified to interpret the documents.

the deposition testimony from other cases attached as Exhibits 5 and 17 are inadmissible.

Deposition testimony is governed by Fed. R. Civ. P. 32, and Fed. R. Evid. 804.  Rule 32 allows a

party to use a deposition taken in another case if it involves the same subject matter between the

same parties.[39]  Rule 804(b)(1) provides an unavailability exception to the hearsay rule where the

statement "is now offered against a party who had—or, in a civil case, whose predecessor in

interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect

examination."  Roco has not shown that these witnesses were previously offered in a case

involving EOG such that it had an opportunity to develop the witness's testimony through

examination.  The Court agrees that deposition testimony taken in a different case with different

parties is inadmissible and should not be considered on summary judgment.[40]

Second, the Court disregards as improper legal argument any attempt to use a legal

opinion from another court as evidence in this case.  While the parties can litigate the weight that

this Court should give to the nonbinding *Pummill* decision by an Oklahoma state court,[41] it is

wholly inappropriate for the Court to consider the ruling of another court as evidence in this case

between different parties.  EOG's objection to Exhibit 13 is therefore sustained.  Similarly, the

Court sustains EOG's objection to Exhibit 6, which includes excerpts from the trial transcript in

*Pummill*.  The excerpts are from a witness who the Court surmises is employed by DCP,

although the attached excerpt provides no indication of this person's title or the foundation for

his testimony.  This person was neither submitted by EOG as a witness in this case, nor subject

to deposition.  It is not a statement of a party opponent, even assuming this witness is testifying

---

[39]Fed. R. Civ. P. 32(a)(8).

[40]*See Nichols v. Schilling*, No. 10-CV-64, 2011 WL 1630981, at *1 (E.D. Wis. Apr. 29, 2011) (citing *Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994); *Hughes v. City of Chicago*, 673 F. Supp. 2d 641, 651 (N.D. Ill. 2009)).

[41]*Pummill v. Hancock Expl. LLC*, No. CV-2011-82 (Feb. 9, 2016) (Doc. 123, Ex. A18).

on behalf of DCP.  Roco has provided no basis for the Court to conclude that the content of this testimony would be admissible at trial.

The Court also disregards as improper legal argument any attempted analysis by Mr. Sharp in his declaration or in the brief about the documents he offers, or notations on the documents themselves.  He provides no information that allows this Court to conclude such analysis could be presented in a form that would be admissible at trial.  He did not prepare the documents.  Instead, he provides his own self-serving interpretation of the evidence.[42]  The jury would be instructed at trial that such argument or annotation by an attorney is not evidence, so it is improper for the Court to consider it on summary judgment.  Roco is free to argue in favor of its interpretation of the evidence in the argument section of the brief, but it may not introduce counsel's analysis as evidence.  The Court therefore disregards Mr. Sharp's analysis in ¶¶ 22, 25, and 29 of his declaration.  The Court also disregards Mr. Sharp's handwritten annotations on Exhibit 8.  All statements of argument, as opposed to fact, provided in fact sections of the brief are disregarded.[43]

The Court excludes the Pate White Paper offered as Exhibit 9.  Roco represents that the author is an in-house attorney for another midstream services company, ONEOK.  Roco argues that Pate's article can be authenticated by ONEOK, or by the publisher of the paper.  But there is no bates stamp on this paper indicating that ONEOK produced it, and even if the publisher could authenticate the article, it does not alleviate the hearsay problem.  Roco offers this paper extensively to support the factual assertion that a title transfer clause in a gas purchase agreement does not in fact result in a true sale of gas, so it is offered for the truth of the matter asserted.

---

[42]While the production of the documents to Mr. Sharp pursuant to a subpoena imbues in him personal knowledge that they were produced by Anadarko or DCP, it does not follow that he has personal knowledge to testify about their significance, or how or why they were created, or to opine about the meaning of the documents.

[43]Fed. R. Civ. P. 56(c)(4); D. Kan. R. 56.1(b), (d).

There is no indication that Mr. Pate's statements were adopted by EOG, so it is not the statement of a party opponent.  There is no indication that Mr. Pate would testify at trial.  Roco does not identify any other exception or exclusion to the hearsay rule that could apply to this exhibit. Therefore, while the document may be used as nonbinding secondary authority in support of Roco's argument, it is inadmissible evidence under the hearsay rule.

Exhibits 18 and 19 are lists of deposition questions for Mr. Bates and Mike Sheppard, a representative of DCP from the *Pummill* case in Oklahoma state court, prepared by defendant's counsel in that case.[44]  The questions were sent as attachments to emails from Richard B. Noulles, who apparently represented the defendant in the *Pummill* case, to unidentified recipients, asking them to review the outlines and let him know if any of the witnesses' responses would be different than what he had indicated was expected.[45]  These exhibits are inadmissible hearsay and again, Roco as the proponent of this evidence offers no basis for their admission.  Nor is there any indication that Mr. Noulles or his agent would testify at this trial to authenticate these documents.

Roco labels Exhibit 21 as "industry papers."  But this exhibit is a table that appears to compile statements made by various persons in the oil and gas industry in other court filings, legislative hearings, 10-Ks and articles.  Roco argues that these "industry papers" "can likewise be authenticated based on the websites and 10-Ks, but even if not, they are sufficient for an expert such as Mr. Reineke and Dr. Foster to rely upon them."[46]  Roco makes no showing that a hearsay exception applies to these many quotations, provided with no context, which are excerpted from sources that are not all offered as exhibits.  Perhaps Roco intends to offer this as

---

[44]Plaintiff represents that these were admitted as trial exhibits in that case.

[45]*See* Doc. 123-2, Ex. A ¶ 19; Doc. 123-20, Ex. 18; Doc. 123-21, Ex. 19.

[46]Doc. 155 at 3.

a summary governed by Fed. R. Evid. 901.  That rule applies to "voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  It does not appear that this would be an admissible summary given that it does not summarize anything, much less voluminous materials that could not be conveniently examined in court.  Instead, the table extracts certain quotations out of primary source material that is beneficial to Roco's position, without context.  Roco does not meet its burden of showing that this exhibit could be presented in a form that would be admissible at trial, so the objection to Exhibit 21 is sustained.[47]

EOG raises a hearsay objection to Exhibit 25, which is written testimony by a predecessor to DCP before the Kansas Senate Committee on Utilities in 2007.  Again, Roco has failed to demonstrate that this testimony would be admissible at trial under an exclusion or exception to the hearsay rule, so the objection is sustained.

## B.      Relevance Objections

EOG argues that the following exhibits attached to Exhibit A, Mr. Sharp's declaration, should be excluded under Rule 401 because they are not relevant to the issues presented by the motion for summary judgment: 1, 5, 6, 8, 9, 10, 13–19, and 21–27.  The Court has already excluded several of these exhibits as inadmissible hearsay.  As described in the discussion about the *Fawcett* decision, the key inquiries here are how the marketable condition rule applies to the lease language in this case, whether EOG delivered gas to the third-party purchasers in a condition acceptable to them, whether the third-party contracts were good faith transactions, and whether EOG fulfilled its implied duty of good faith and fair dealing to Roco.[48]

---

[47]Given the Court's ruling *infra* excluding Plaintiff's expert reports, this evidence could not be admitted through the experts either.

[48]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1042 (Kan. 2015).

The Court sustains EOG's objection to the ONEOK Annual Report, marked as Exhibit 27.  It is undisputed that the gas produced by the Roco well was processed by either DCP or AESC pursuant to three different gas purchase agreements.[49]  The Court must only determine whether those agreements constitute good faith transactions under the standard set forth in the Uniform Commercial Code.[50]  Roco has failed to show how an unaffiliated company's Annual Report could be relevant to that determination, particularly given the Court's reading of *Fawcett* that the quality or condition of the gas does not determine marketability.  The Court therefore sustains EOGs' relevance objection to Exhibit 27.

Conversely, the Court finds that the objections should be overruled as to exhibits that pertain or may pertain to the well at issue in this case, or that demonstrate the way EOG coded or considered the Roco lease internally.  Therefore, Exhibits 1, 10, 14, 22, and 26 are admissible, despite their breadth, at the summary judgment stage.  Exhibits 23 and 24 are relevant to the Conservation Fee claim and are also admissible.

### C. Motions to Exclude Declarations of Bates, Cobb, Foster, and Reineke

### 1. Standards

Lay opinion testimony is governed by Fed. R. Evid. 701, and is "limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[51]

---

[49]Plaintiff challenges whether the Anadarko entity that is a third-party purchaser in this case is a wholly owned subsidiary of Anadarko Petroleum, but never makes clear why this dispute is material on summary judgment. The Court need not resolve this issue and therefore need not consider the documents offered for that purpose: Exhibits 15 and 16.

[50]*See Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *4 (D. Kan. July 28, 2016).

[51]Fed. R. Evid. 701.

In contrast, Rule 702 governs expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.[52]

The Court has broad discretion in deciding whether to admit expert testimony.[53]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[54]  In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[55]  To determine reliability, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[56]  Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[57]  An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[58]  And it is not necessary to prove that the expert is "indisputably correct," but only

---

[52]Fed. R. Evid. 702.

[53]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

[54]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[55]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[56]*BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[57]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[58]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[59]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[60]  But "the gatekeeping inquiry must be tied to the facts of a particular case."[61]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[62]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[63]  In this case, the parties do not request a hearing.  The Court has carefully reviewed the submissions filed with the motions and believes this review is sufficient to render a decision.

### 2.    Alan Bates and Michael Cobb

Initially, Roco moved to exclude the Alan Bates and Michael Cobb declarations attached to EOG's reply as inadmissible expert opinion testimony.  Roco argued that these witnesses were not designated as experts, that Bates's opinions contradict testimony he provided in another case, that they are not qualified to render the opinions in their declarations, and that their opinions are incorrect.  But the Court overrules and denies this motion because Bates and Cobb are not being offered as experts.  Expert testimony is testimony that requires specialized or technical skill and

---

[59]*Id.*

[60]*Daubert*, 509 U.S. at 593–94.

[61]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (quotations omitted).

[62]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[63]*Id.*

knowledge.[64]   In contrast, lay opinion testimony may be offered based on "observations that are common enough and require a limited amount of expertise, if any."[65]

Bates is offering lay opinion testimony that meets the standards set forth in Rule 701. Bates states in the declaration that he is the Director of Project Development in the Mid-Continent Region for ONEOK Field Services Company, LLC ("OFS").   Although OFS is not a third-party purchaser in this case, Bates offers testimony about industry standards that relate to third-party purchase agreements in Kansas.   Bates previously held the position of Director-Oklahoma Gas Supply for OFS, and held a similar position with respect to OFS's Kansas assets in recent years.   He is familiar with OFS's operations in Kansas and with its gas purchase contracts with oil and gas producers in Seward County.   The Court finds that Bates's opinion is based on his personal first-hand knowledge of OFS's operations, derived from his position there.[66]   While Bates may not have personal knowledge of the relationship between Roco and EOG, or between EOG and DCP, he can offer a lay opinion about the contractual relationship between his employer and operators such as EOG, and their use of gas purchase contracts.   His opinions as to OFS practices and about industry custom are not based on scientific, technical, or other specialized knowledge; they are based on his personal knowledge of industry custom. Bates's opinions are thus admissible under Rule 701.   Roco's arguments about the substance of Bates's opinion go to the weight and not the admissibility of the evidence.

Similarly, Cobb is offered as a lay and not an expert witness.   He is the Managing Director of DCP for the Liberal, Kansas area, and has been personally involved in DCP's

---

[64]*James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216 (10th Cir. 2011).

[65]*Id.* (quoting *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995)).

[66]For the same reasons described in excluding certain statements in Mr. Sharp's declaration, the Court disregards the statements in paragraph 11 of Bates's declaration about the meaning of "marketable" under *Fawcett*. Doc. 128-4, Ex. D ¶ 11.

purchases of gas in Kansas, its midstream operations, and sales to third parties.  He is familiar with DCP's gas purchase contracts with EOG.  Cobb's opinions about DCP's practices and his understanding of industry custom are not based on scientific, technical, or other specialized knowledge.  They are based on personal knowledge.  Like the Bates declaration, Roco's arguments about the substance of Cobb's opinion go to the weight and not the admissibility of the evidence.

To the extent Roco argues for the first time in the reply that its motion to exclude is based on the failure to timely disclose Bates and Cobb as *lay* witnesses, the Court denies the motion as well.  At Roco's behest, the discovery in this case, and the facts addressed in the summary judgment motion, multiplied substantially after the initial motion was filed.  Roco has clearly been on notice of Bates and Cobb's roles and the basis for their testimony, given counsel's references to sworn testimony and declarations in other cases in which they have been involved. And Roco had the opportunity to depose both declarants during the Rule 56(d) discovery stay and opted to cancel those depositions.  Moreover, Roco has been granted leave to file a summary judgment sur-reply to address this evidence.  There is no prejudice to Roco by allowing EOG to rely on these lay witnesses in the reply.

### 3.    Daniel T. Reineke and William G. Foster

Roco offers Reineke and Foster as experts in opposition to summary judgment.  Reineke is a petroleum engineer with more than forty years of experience working in the oil and natural gas industry.  He has served as an operator, drilling engineer, and production engineer.  He has experience operating wells and entering into oil and gas leases, as well as negotiating gathering, processing, and sales agreements.  He is familiar with all phases of the natural gas production process.  Reineke provides explanations and opinions on the following issues: (1) how raw gas

such as that extracted from the well operated by EOG is produced, what the physical characteristics and qualities of that raw gas are as it comes out of the well bore and the subsequent processes necessary to transform the raw gas stream (and the constituents therein) into products that are capable of sale in the commercial marketplace; (2) what constitutes a good faith sale; and (3) EOG's method of paying royalties owing from the sale of products from the gas stream.

Foster is an economist and the President of Foster Economic Research; he has been an independent consultant in the energy field, with an emphasis on natural gas, for more than forty years. Foster's expert report addresses the following issues: (1) whether raw gas is a marketable product at or near the well; (2) when gas and its constituent parts have been transformed into marketable products such that they can be bought and sold in the commercial marketplace; (3) whether title transfers in contracts that transfer title to the raw gas prior to the provision of midstream services constitute "good faith sales" as to the royalty owners; and (4) the third-party purchase with EOG discussed in the motion for summary judgment.

EOG moves to exclude these expert reports as follows: (1) Reineke's opinion that the gas that EOG sold to DCP was not in marketable condition until after processing for residue gas and after fractionalization to achieve marketable NGL products; and (2) Foster's and Reineke's opinion that the EOG gas contracts with DCP were not good faith sales because the gas was sold before being put into marketable condition. EOG argues that Foster and Reineke are unqualified to give opinions on the marketable condition of gas, and that their opinions on these issues contravene the court's holding in *Fawcett*.

The Court agrees with EOG that these experts' opinions must be excluded because they plainly contradict the Kansas Supreme Court's holding in *Fawcett*. As Judge Melgren recently

stated in excluding the same expert opinions in a similar case, "*Fawcett* dictates that gas is in marketable condition if it is marketed in a good faith transaction."[67]  He concluded that "[t]hese opinions are conclusory and reverse the standard set forth in *Fawcett*."[68]  Accepting the challenged opinions in this case similarly would violate *Fawcett*, because it would require the Court to accept a standard contrary to the one set forth in *Fawcett*— that there can be no good faith transaction before the gas is placed in marketable condition, which is defined by certain qualitative standards that can never be met at the wellhead.

In addition to contradicting the controlling law on Roco's claim in this case, the experts' opinions also must be excluded because they are legal conclusions.  Fed. R. Evid. 704(a) provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Still, "testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."[69]  Nor may an expert "state legal conclusions drawn by applying the law to the facts."[70]

It is clear to the Court that Roco's experts simply disagree with the *Fawcett* decision.  A few examples illustrate the blatant contradictions and conclusory assertions of law.  First, the contention upon which both experts base their opinions that raw gas and its constituent parts can

---

[67]*Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *5 (D. Kan. July 28, 2016).

[68]*Id.* at *6.  While it is true that the initial expert reports in *Roderick* were prepared before the *Fawcett* decision, *see id.* at *5, their opinions submitted in this case post-*Fawcett* are not markedly different.  These experts disagree with the *Fawcett* court and insist raw gas cannot be sold in a good faith transaction until it is marketable, as defined by certain qualitative standards.   They opine here, as they did in *Roderick*, that the gas must meet certain objective criteria to constitute a good faith sale in the commercial marketplace.  The Court also notes that the parties in *Roderick* were allowed supplemental briefing after the *Fawcett* decision, and that the plaintiff's supplemental brief included Foster's supplemental declaration regarding his opinion on good faith sales.  And, XTO filed a separate motion for summary judgment on the marketable condition rule after *Fawcett*. The initial brief was filed on November 13, 2015; the response was filed on January 13, 2016; the reply was filed on February 16, 2016, well after the *Fawcett* decision was issued.  *See Roderick*, No. 08-1330-EFM-GEB, Docs. 353–54, 357-1, 370–71, 404.

[69]*Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc).

[70]*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003).

only be in a marketable condition "when they are in the physical condition to be bought and sold in a commercial marketplace,"[71] was soundly rejected by the Kansas Supreme Court in *Fawcett*. While it is true that "[w]hat it means to be marketable remains an open question, . . . the answer is not simply, as Fawcett would have us hold, interstate pipeline quality standards or downstream index prices."[72]  In fact, the court observed that none of the cases upon which it based its decision contained a "discussion of a precise quality or condition at which gas becomes 'marketable.'"[73]

Second, Foster states his understanding of *Fawcett* as requiring the operator to "enter into a 'good faith sale' of gas in marketable condition."[74]  But this is not what *Fawcett* holds. *Fawcett* holds that "the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction."[75] Similarly, Reineke opines that even if a sale of gas occurs at the wellhead or gathering inlet, "a good faith market sale cannot be completed until the gas is in marketable condition at the market, which in this case, as demonstrated by all of the gas contracts, the gas quality, and the need for the Midstream Services, is at the Index pool for residue gas and OPIS Conway for NGLs."[76]  The experts opine that a factual determination of whether the gas is "marketable" informs the good faith analysis.  As already discussed, this is a misreading of *Fawcett*.  This misreading of *Fawcett* dictates the experts' ultimate opinions that the gas purchase contracts in this case cannot

---

[71]Doc. 125, Foster Report, Ex. C at 3; Doc. 124, Reineke Report at 10; Doc. 128-15, Ex. H at 62:5–9 ("It is my opinion that [gas] is a marketable product downstream of the processing plant where you have residue gas that is a fungible commodity that meets the quality requirements of the interstate pipeline.").

[72]*Fawcett v. Oil Producers Inc. of Kan.*, 352 P.3d 1032, 1042 (Kan. 2015).

[73]*Id.*

[74]Doc. 125, Foster Report, Ex. C at 2.

[75]*Fawcett*, 52 P.3d at 1042.

[76]Doc. 124, Reineke Report, Ex. B at 17.

be good faith sales because they do not constitute a sale of what they deem to be "marketable products"—raw gas prior to gathering and processing.  But again, these opinions conflict with governing Kansas law, which this Court is bound to follow.

This Court is bound to apply governing Kansas law to the Kansas breach of lease claim in this matter. The *Fawcett* decision clearly holds that gas may be sold and marketed at or near the wellhead, and that if it is sold at or near the wellhead in a condition acceptable to the purchaser in a good faith sale, it has satisfied the marketable condition rule.[77]  The court also explained that there may be circumstances where the plaintiff can show that a third-party purchase agreement was a bad faith transaction, or where the operator violated its implied duties of marketability or of good faith and fair dealing.[78]  To accept the expert opinions in this case would be to accept the proposition that no third-party purchase agreements made before gathering and processing could ever be made in good faith.  While the Kansas Supreme Court did indeed leave open what circumstances would constitute a breach of good faith, it did not contemplate that *all* wellhead or midstream sales agreements would violate the implied duties.  In light of the governing law in Kansas, the Court must exclude both expert opinions under Rule 702 and *Daubert*.  The Court sustains EOG's objections to Exhibits B and C, and Reineke's deposition testimony attached as Exhibits A3–4.

## V.    Uncontroverted Facts

In considering the parties' factual submissions, the Court excludes the evidence described above that could not be presented in admissible form at trial, and disregards all factual assertions that constitute legal argument by counsel, or are not supported by specific citations to the record.

---

[77] *Fawcett*, 52 P.3d at 1042.

[78] *Id.*

What remains are the following facts that are uncontroverted for purposes of summary judgment, and viewed in the light most favorable to Roco as the nonmoving party.

Plaintiff Roco was a lessor under an oil and gas lease with EOG, the lessee, dated November 7, 2005 (the "Roco lease").  The lease provides for royalty payment to Roco

> for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products therefrom, three-sixteenth (3/16), at the market price at the well, (but, as to gas sold by lessee, in no event more than three-sixteenth (3/16) of the proceeds received by lessee from such sales), for the gas sold, used off the premises, or in the manufacture of products therefrom, said payments to be made monthly.[79]

Exhibit A to the Roco lease provides that "[a]ll gas constituting the share of the Lessor shall be delivered from the wellhead to the point of sale, free of any production, compression, or transportation costs to the Lessor."[80]  It also provides:

> Notwithstanding anything on the printed lease form to the contrary, the royalties to be paid by Lessee are as follows: On oil, 3/16ths of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipeline to which the wells may be connected free of any pre- or post-production charges.  On gas, including casing head gas, condensate or other gaseous substances, produced from said land or sold or used off the premises or for the extraction of gasoline or other products therefrom, 3/16ths of the gross proceeds of the gas so sold or used, plus reimbursement for any deductions or adjustments or other reductions made from the price of gas for costs of gathering, transportation, compression or marketing of the gas or other post-production cost from the well to the point of sale.[81]

The Roco lease was coded in EOG's internal accounting system as "free from deducts." This coding means that when EOG calculated royalty to Roco, it was not to take deductions from Roco's royalty payment for its proportionate share of any post-production costs incurred by EOG to the point of EOG's sale to an unaffiliated third-party purchaser.

---

[79] Doc. 70-2, Ex. 1 ¶ 4.

[80] Doc. 70-2, Ex. 1A ¶ A.

[81] *Id.* ¶ O.

Under the lease, Roco had an interest in one EOG-operated well: the Cope #17-1 well, located in Seward County, Kanas.  The Cope well first produced in April 2006, and was classified as an oil well, but it also produced casinghead gas that was metered and accounted for as natural gas at the wellhead, separate from the oil produced and sold from the well.

EOG sold gas from the Cope #17-1 well to unaffiliated third-party purchasers.  There are three separate contractual arrangements during the relevant time period.  **First, from April 2006 through September 2008**, the casinghead gas produced from the well was the subject of an October 1, 2005 Gas Purchase Agreement between EOG and AESC.  In 2007, DCP acquired the assets of AESC.  AESC is not related to or affiliated with any EOG entity.  In Kansas, DCP and its affiliates purchase gas at or near the wellhead from a number of producers, including EOG, and engage in gas gathering, gas processing and treating, gas and NGL transmission, and gas, helium, and NGLs marketing.  DCP operates gas gathering and transmission pipelines and supplies gas to the National Helium Plant near Liberal, in Seward County.  At the end of 2014, DCP had about 327 active gas purchase contracts in Kansas, with many different suppliers covering roughly 1136 wells or other delivery points.

The 2005 AESC contract was an arms' length agreement negotiated by representatives of EOG's marketing department, and AESC.  This 2005 agreement provides that EOG is the seller and AESC is the buyer.  It begins by stating that "Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain quantities of natural gas produced form the Wells."[82]  Under the contract, EOG was required to install any facilities necessary to deliver the gas "from the wellhead to the Delivery Point," and was required to deliver gas at the Delivery Point.[83]  "Delivery Point" under the contract means "the point at which Buyer purchases Gas from Seller

---

[82]Doc. 73, Ex. 2 at 3.

[83]*Id.* ¶ 3.1.

hereunder, which point shall consist of the inlet of the relevant meter for each Well, as specified under the heading 'Meter Number' on 'Exhibit A.'"[84]   Exhibit A identifies the meter number for the Cope #17-1 well.  Title to all gas purchased by AESC passes under the contract "at the relevant Delivery Point."[85]

The contract includes certain quality requirements for the gas sold thereunder.  The casinghead gas delivered to AESC under the 2005 agreement was in a condition acceptable to AESC.  AESC accepted the gas and paid EOG.  EOG paid Roco royalty based on its proportionate share of the gross proceeds it received from AESC.  EOG did not take deductions from the royalty for production costs, or post-production costs that EOG may have incurred up to the point of sale.

**Second, from October 2008 through June 2009**, the casinghead gas produced from the Cope #17-1 well was the subject of a May 1, 2007 Gas Purchase Agreement between EOG and DCP.  The 2007 agreement provides that EOG is the seller and DCP is the buyer.  It states that:

> Seller will sell and deliver and Buyer will purchase and receive Gas owned or controlled by Seller and produced from (i) all well(s) connected directly to [AESC's] gathering system upstream of the Delivery Point defined in Section 2 below after May 1, 2007, and (ii) all well(s) connected to a gathering system owned by Seller where Seller has connected that gathering system to AESC's gathering system after May 1, 2007 (collectively, "Committed Wells").[86]

The delivery point under the contract was off the leased premises, in the gas field between "the AESC Liberal Line and the panhandle Eastern Pipe Line Company, LP Lakin Line."[87]  "Title to the Gas and all its components shall pass to and vest in Buyer at the Delivery Point . . . ."[88]

---

[84] *Id.* ¶ 1.6.

[85] *Id.* ¶ 8.1.

[86] *Id.*, Ex. 3 ¶ 1.

[87] *Id.* ¶ 2.

[88] *Id.*

Anadarko Gathering Company ("Anadarko") was the gatherer of the gas from the Cope #17-1 well, and delivered the gas for EOG from the wellhead to the DCP Delivery Point under a separate May 1, 2007 Gas Gathering Agreement between Anadarko and EOG. Anadarko charged EOG a monthly fee to ship the gas to the DCP Delivery Point; it was also subject to an in-kind deduction of 4.52% for "Fuel,"[89] although there is no admissible evidence demonstrating either that EOG was charged this fee, or that it was deducted from Roco's royalty. Because Roco was coded "free from deducts" in EOG's internal accounting system, the monthly gathering fee charged to EOG under the Anadarko Gas Gathering Agreement was never deducted from Roco's royalty payment.

In exchange for the casinghead gas delivered to DCP at the Delivery Point under the 2007 agreement, DCP agreed to pay EOG a percentage of the index price published in an industry publication for Panhandle Eastern Pipe Line Company, LLC mainline pipeline spot gas trades for residue gas, and a percentage of the net weighted average prices per MMMBtu received by DCP for NGLs, less costs for transportation, fractionation, storage, exchange or applicable fees, taxes, or charges downstream of DCP's facilities for NGLs. The contract provides that that this was "full consideration for Seller's Scheduled Gas (including all of its components)."[90]

At all times from October 2008 through June 2009, the gas delivered to DCP under the 2007 Gas Purchase Agreement was in a condition acceptable to DCP. DCP accepted the gas and paid EOG the DCP 2007 agreement proceeds. No costs were assessed to Roco or deducted from

---

[89] *Id.*, Ex. 3A. Defendant refers to this as an in-kind deduction for volumetric loss; Plaintiff refers to it as "FL&U."

[90] *Id.*, Ex. 3 ¶ 4.1.

Roco's royalty payments to meet DCP's requirements as to the quality of the gas at the time and place of delivery under the contract.

**Third, from July 2009 until February 2013**, the Cope well was re-classified as a gas well and subject to a July 1, 2009 Gas Processing Agreement between EOG and DCP.  EOG sold all of its interests in the well and the Roco lease effective April 1, 2013; the settlement date for last production to EOG was February 2013.  The 2009 agreement describes the point of sale for the residue gas and NGLs at the tailgate of DCP's processing plant, where title passed from EOG to DCP.  Under this agreement, DCP took possession of the gas from the Cope #17-1 well at a designated central delivery point in the field, off the leased premises.  DCP is not related to or affiliated with any EOG entity.  The 2007 DCP agreement and the 2009 DCP agreement were arms' length agreements negotiated by representatives of EOG' s marketing department, and DCP.  Anadarko was still the gatherer of the gas from the well, and delivered the gas for EOG from the wellhead to the delivery point under the Anadarko Gas Gathering Agreement.

Under this 2009 agreement, the gas delivered to DCP was in a condition acceptable to DCP.  In exchange for the residue gas and NGLs delivered and sold to DCP under the DCP Gas Processing Agreement, DCP agreed to pay EOG 100% of DCP's revenues from its sale of the residue gas and NGLs.  DCP charged EOG an applicable processing fee representing a percentage of the sale price.  Because Roco was coded in EOG's internal accounting system as "free from deducts," no portion of the DCP Processing Fee was deducted from Roco's royalty payment; Roco's royalty was calculated based on Roco' s proportionate share of 100% of the proceeds it received under the 2009 agreement.

DCP and its midstream competitors routinely purchase raw gas at the wellhead under two part payment percentage of proceeds and percentage of index contracts throughout Kansas.  DCP

has purchased raw natural gas at or near the wellhead from many Kansas gas producers, including EOG.  DCP and other midstream gas purchasers such as ONEOK add value to the purchased wellhead gas in several ways as the gas moves toward end consumers.  Midstream purchasers added value leads to higher end values at downstream consumption points.  There is active competition among multiple midstream gas purchasers for wellhead gas purchases from gas producers like EOG.  Typical DCP Kansas gas purchase contracts include as a material term a title transfer at agreed wellhead, or wellhead area delivery points.

There is also a market downstream from the wellhead for natural gas, including at the tailgate of a gas processing plant where midstream purchasers like DCP sell treated and processed natural gas in large quantities to purchasers shipping on interstate or intrastate mainline pipelines.  Percentage of proceeds and percentage of index contracts allow the producers and their associated royalty owners to share in the benefit of a downstream pipeline price for the constituents of raw gas purchased at the wellhead from the producer.

Kansas imposes a regulatory fee on operators of oil and gas wells known as a Conservation Fee.  Between April 2006 and March 2011, EOG deducted Roco's proportionate share of conservation fees owed to the Kansas Corporation Commission ("KCC") from Roco's royalty payments.  Beginning in production month April 2011, EOG ceased taking any deductions from Roco's royalty for conservation fee payments EOG made to the KCC.  On March 7, 2016, EOG issued a reimbursement check to Roco for all prior conservation fee deductions taken from Roco's royalty from first production in April 2006 to March 2011, the last production month for which EOG deducted conservation fees.  This amount represents all prior conservation fee amounts deducted from Roco's royalty payments, plus interest at a rate of 10% per annum.  EOG sent a check to Roco in the amount of $676.12 on March 11, 2016,

representing conservation fees deducted from royalty payments in the amount of $384.70, plus interest in the amount of $291.42.  Roco has not cashed the check.

## VI.     Discussion

### A.     Marketable Condition Rule

As described earlier in this Order, Roco's response to the *Fawcett* decision hinges on its claim that there were three "appellate concessions" in *Fawcett* not made in this case that distinguish the Kansas Supreme Court's holding and render it in applicable here: (1) the gas here was not sold at the wellhead; (2) the gas here was not marketed at the wellhead; and (3) unlike in *Fawcett*, Roco challenges EOG's good faith and prudence in entering into the purchase agreements with AESC and DCP.  The Court does not agree with Roco that these "appellate concessions" distinguish the facts of this case from *Fawcett*.  Based on the uncontroverted facts of this case, the marketable condition rule was satisfied because the leases provided for royalties based on gross proceeds of the gas sold, plus reimbursement for any deductions taken to process or market the gas from the well to the point of sale, and the gas was delivered in a condition acceptable to the third-party purchasers in a good faith transaction.  Moreover, Roco has failed to point this Court to case-specific evidence that creates a genuine issue of material fact about whether EOG breached its implied duty of good faith and fair dealing under the lease.

### 1.     Geography of the Sales and Royalty Calculations

"The geography of the sale [of gas] is a question of fact, and the geography of the royalty calculations turns on the lease language, the interpretation of which is a question of law for the Court."[91]  To determine the royalty computations, Kansas courts look to the royalty

---

[91]*Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM, 2016 WL 4039641, at *8  (D. Kan. July 28, 2016); s*ee also Fawcett v. OPIK*, 352 P.3d 1032, 1038 (Kan. 2015).

language in the lease.[92]   Under Kansas law, oil and gas leases generally fall within three types:

(1) proceeds; (2) market value; and (3) *Waechter*.[93]   Under a proceeds lease, the lessee pays the

royalty owner a share of the actual monies received from the sale of the gas.[94]   Under a market

value lease, royalty payments are based on the price that would be paid by a willing buyer to a

willing seller in a free market.[95]   A *Waechter* lease is a hybrid of a proceeds and market value

lease; "royalties are calculated based on either proceeds or market value, depending on the

location where gas is sold."[96]

> The lease between Roco and EOG requires EOG to pay royalties as follows:
>
> for gas of whatsoever nature or kind produced and sold, or used off the premises,
> or used in the manufacture of any products therefrom, three-sixteenth (3/16), at
> the market price at the well, (but, as to gas sold by lessee, in no event more than
> three-sixteenth (3/16) of the proceeds received by lessee from such sales), for the
> gas sold, used off the premises, or in the manufacture of products therefrom, said
> payments to be made monthly.[97]

Exhibit A to the lease makes clear that if gas, including casing head gas, is "sold or used off the

premises or for the extraction of gasoline or other products therefrom 3/16ths of the gross

proceeds of the gas so sold or used, plus reimbursement" for certain deductions from the well to

the point of sale should be paid.[98]   This is a proceeds lease.   Under *Fawcett*, this type of lease

requires an operator to pay royalty on the proceeds from its sale to a third party without

---

[92]*Fawcett v. Oil Producers, Inc. of Kan*, 306 P.3d 318, 321–22 (Kan. Ct. App. 2013), *rev'd on other grounds*, 352 P.3d 1032 (Kan. 2015); *Smith v. Amoco Prod. Co.*, 31 P.3d 58, 77 (Kan. 2001); *Sternberger v. Marathon Oil Co.*, 894 P.2d 788, (Kan. 1995).

[93]*Fawcett*, 306 P.3d at 321.

[94]*Id.* (citing *Smith v. Amoco Prod. Co.*, 31 P.3d 255, 268–69 (Kan. 2001)).

[95]*Id.* (citing *Matzen v. Cities Serv. Oil Co.*, 667 P.2d 337 (1983)).

[96]*Roderick*, 2016 WL 4039641, at*8 n.62 (discussing *Waechter v. Amoco Prod. Co.*, 537 P.2d 229, 247–49 (Kan. 1975)).

[97]Doc. 70-2, Ex. 1 ¶ 4.

[98]*Id.*, Ex. 1A ¶ O.

deducting any pre-sale expenses required to make the gas acceptable to the third-party purchaser.[99]

Roco does not discuss the three distinct contractual periods separately, but generally argues that they were not wellhead sales and that proceeds under the lease means that any midstream costs before a sale at the interstate pipeline must not be deducted before royalties are calculated.  There is no genuine issue of material fact that during the first time period at issue in this case, between April 2006 and September 2008, casinghead gas was sold at the wellhead under the terms of the 2005 AESC purchase agreement.  Title transferred at the "delivery point," which was the meter number for the well under Exhibit A to the agreement.  Kansas law has recognized that raw gas can be sold at the wellhead, notwithstanding the quality of the gas, so long as it is in a condition acceptable to the purchaser,[100] so Roco's argument that there is no market for gas at the well is unavailing.  Under the terms of the lease, a percentage of gross proceeds were due Roco, without deductions for costs incurred from the well to the point of sale.

The second and third time periods at issue in this case involve third-party purchases off the leased premises.  Between July 2008 and June 2009, EOG sold casinghead gas from the Cope well to DCP, and separately contracted with Anadarko to gather the casinghead gas and deliver it to DCP at the delivery point in the gas field.  Between July 2009 and February 2013, EOG sold gas residue and NGLs at the tailgate of the processing facility, again using Anadarko to deliver the gas to DCP.  Although Roco points out that these were sales in the field and not at the wellhead, the Court does not find this fact to be material.  If gas can be marketable at the well, it

---

[99]*Fawcett*, 306 P.3d at 1042; *see also Roderick*, 2016 WL 4039641, at *8  (acknowledging that determining "whether an operator satisfied its duty to market is much easier when a proceeds lease is involved.").

[100]*Fawcett*, 352 P.3d at 1035, 1039 (acknowledging that raw gas requires processing to transform it into pipeline-quality gas, and that some of this processing occurs at the wellhead and some occurs away from it; rejecting Fawcett's claim that "raw natural gas sold at the well is not marketable as a matter of law or fact until it is processed"); *see also Waechter*, 537 P.2d at 249; *Gilmore v. Superior Oil Co.*, 388 P.2d 602, 606 (Kan. 1964).

can certainly be marketable further downstream, and *Fawcett* determined that interstate pipeline quality is not the measure of marketability.[101]  Of course, as a practical matter, there are more deductible costs involved in a sale away from the wellhead because "a nonworking interest owner is not obligated to bear any share of production expense . . . to transform gas into a marketable product."[102]  It is undisputed that the gas at issue under these contracts at least went through a gathering process, governed by another contract with Anadarko, prior to the sale. During both time periods, it is undisputed that EOG calculated royalties based on a percentage of index price, and did not deduct any costs incurred used to transform the gas into a marketable product before title transferred at the delivery point.  As with the first time period, the Court finds no genuine issue of material fact about whether the royalty should be calculated based on gross proceeds received from the sale of gas at the specified delivery points in the field, which is when title transferred.

## 2. Acceptable to the Purchaser in a Good Faith Transaction

 "The only relevant inquiry into the quality of gas is whether it was in a condition acceptable to the purchaser.  Whether raw or completely processed, gas is in marketable condition if a purchaser accepts it as is in a good faith transaction."[103]  The uncontroverted evidence establishes that AESC, and then DCP, desired to purchase gas products from EOG, that the gas was accepted by DCP and AESC, and that no deliveries were rejected nor costs imposed for failure to meet certain qualitative standards set forth in the purchase agreements.

Roco urges that the gas in this case was not marketable at the well based on counsel's inadmissible comparison of gas analysis for the gas products sold to AESC and DCP, to the

---

[101]*Fawcett*, 352 P.3d at 1039.

[102]*Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 800 (Kan. 1995).

[103]*Roderick*, 2016 WL 4039641, at *4.

standards in the gas purchase contracts, which he claims shows that they did not meet the quality standards set forth in the gas purchasing contracts.  But even assuming these exhibits were admissible and tended to show that the quality of the gas products did not conform to the standards in the purchase agreements, it would be immaterial.  The only relevant inquiry is whether the third-party purchasers accepted the gas without deductions if the gas did not meet qualitative standards in the contracts.  The uncontroverted evidence establishes that they did accept the gas as is.  There is no genuine issue of material fact about whether the gas was acceptable to AESC and DCP when it was delivered.

In addition to gas being in a condition acceptable to the purchaser, under the marketable condition rule, EOG's sale of gas to AESC and DCP must have been made in good faith.[104] Since a gas purchase agreement is considered a sale of goods under Kansas law, the Uniform Commercial Code ("UCC") applies.[105]  Under the UCC, good faith "means honesty in fact and the observance of reasonable commercial standards of fair dealing."[106]  The UCC comment to this definition explains:

> [T]he definition of "good faith" in this section requires not only honesty in fact but also "observance of reasonable commercial standards of fair dealing." Although "fair dealing" is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed.  This is an entirely different concept than whether a party exercised ordinary care in conducting a transaction.  Both concepts are to be determined in the light of reasonable commercial standards, but those standards in each case are directed to different aspects of commercial conduct.[107]

The determination of good faith is a question of fact.[108]

---

[104]Similar to *Fawcett* and *Roderick*, Plaintiff does not challenge the price that Defendants received for the gas.  Therefore, as Judge Melgren explained, the prudent operator standard does not apply and instead the Court focuses only on whether there was a sham sale, as urged by Plaintiff.  *Id.* at *4.

[105]K.S.A. § 84-2-102; *Sunflower Elec. Co-op, Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 769 (Kan. Ct. App. 1981).

[106]*Id.* § 84-1-201(20); *see also Roderick*, 2016 WL 4039641, at *6 (applying the UCC under similar facts).

[107]K.S.A. § 84-1-201(20) cmt.

EOG comes forward with uncontroverted evidence that the gas purchase agreements were arm's length transactions between two unaffiliated companies. But Roco challenges the contracts as "sham sales," "paper title transfers," or "pre-market sales" designed solely to avoid EOG's duty to market and prepare the raw gas for market. As with its wellhead sale argument, Roco's good faith argument relies on the generalized premise that no third-party purchase agreement prior to the interstate pipeline could be a good faith transaction. The Court rejects this generalized argument and finds no case-specific evidence that creates a genuine issue of material fact about good faith in this case. Roco presents no evidence that the parties in this case conspired or colluded to evade the marketable condition rule, or that the three particular transactions at issue were not executed in good faith.

EOG has submitted evidence from a DCP representative that the DCP agreements are representative of those routinely entered into by DCP with gas producers, including with EOG. Based on his experience, Cobb opines that these contracts were consistent with reasonable and customary commercial standards in the industry. The Court also notes that the third-party purchase agreements in *Fawcett* were almost identical to the first third-party purchase agreement in this case. In *Fawcett*, "third-party purchasers pay OPIK for the raw gas received at the wellhead based on a percentage of specified index prices or the third-party purchasers' actual revenue when that gas is sold to others, reduced by certain costs."[109]

Roco argues that marketability requires the gas to be of a quality that can be sold "at the ordinary price in a recognized market." It contends that the mere fact that it is capable of sale is insufficient; raw gas is incapable of sale before full GCDTP services can be performed and the products are sold downstream. These are the same assertions in the expert reports, which this

---

[108]*See, e.g.*, *Roderick*, 2016 WL 4039641, at *4.

[109]*Fawcett*, 352 P.3d at 1036.

Court has excluded as contrary to controlling Kansas law.  For the same reasons it excluded

those opinions, the Court cannot find that this argument negates the good faith element of

marketability set forth in *Fawcett*.  Roco's argument turns the holding of *Fawcett* into a circular

analysis: the duty to make gas marketable is satisfied when the operator delivers the gas to the

purchaser in a condition acceptable to the purchaser in a good faith transaction, but it can only be

a good faith transaction if it is marketable.  Accepting Roco's argument would also write out of

*Fawcett* its rejection of the claim that the gas must be in a certain physical condition to be sold in

the commercial marketplace.[110]

Roco argues that EOG engaged in GCDTP services and passed those expenses along to

Roco.  But there is no admissible evidence to support this contention, and counsel's assertions

based on comparing the gas analysis exhibit, plant statement, and gas contracts generally are

insufficient.  Roco submitted Exhibit 11, which is a disc of many gas contracts involving EOG.

But Roco never provides specific citations to these many contracts, and fails to explain how they

tend to show that the contracts at issue in this case were negotiated in bad faith.  And as

described above, any problems with the quality of the gas not reaching standards set forth in the

purchase agreements are immaterial because AESC and DCP consistently accepted the gas at the

time of delivery, which is the only relevant inquiry in terms of the quality of gas.

EOG has submitted evidence about the nature of the transactions in this case, in the

context of reasonable commercial standards in this industry.  Roco points to nothing about the

facts surrounding the specific transactions in this case, which call their good faith into question.

In fact, Roco makes no attempt to discuss the three separate third-party purchase agreements at

issue in this case at all—another indication of its generalized grievance against third-party

---

[110]*Id.* at 1042 (rejecting that standard as contrary to Kansas law), and 1040 ("We disagree with Fawcett's
equating 'marketable condition' with interstate pipeline quality.").

purchase arrangements.  Roco posits that raw gas can never be sold at the wellhead or in the field

in a good faith transaction.  Under *Fawcett*, Roco must come forward with specific evidence

about the transactions in this case to create a genuine issue of material fact on good faith.[111]

       Roco's argument that the purchase agreements are a sham is not specific to the purchase

agreements in this case.  It depends on a finding by this Court that all such purchase agreements

are a sham, despite the court's acknowledgement in *Fawcett*, that "most natural gas produced in

Kansas is sold under formula-based purchase agreements similar to those in this case."[112]

Instead, the Court focuses on evidence concerning the fairness of the conduct between the parties

in these specific transactions—when the purchase agreements were executed in 2005, 2007, and

2009.  In these agreements, EOG is listed as a seller and the third party is listed as a buyer.  They

are unaffiliated parties and the contracts were negotiated at arm's length.  DCP considers the

agreements to be fair and reasonable and typical of the industry, and another midstream

purchaser, ONEOK, also considers these agreements typical of the industry.  EOG sold

casinghead gas from the Cope well to AESC and then DCP at a designated receipt point at the

---

[111]Plaintiff relies heavily on an Oklahoma state district court's decision on summary judgment in *Pummill v. Hancock Expl. LLC*, No. CV-2011-82 (Feb. 9, 2016) (attached as Doc. 123, Ex. A18).  This decision carries no weight with this Court.  First, it interprets Oklahoma and not Kansas law.  For this reason, the *Pummill* court declined to acknowledge that the *Fawcett* decision was even persuasive to the facts of that case.  Second, the *Pummill* court found that the rule in *Fawcett* did not apply to a Defendant's counterclaim requesting a declaratory judgment that gas from the well at issue is a marketable product at the custody transfer meter.  Finally, there was evidence in that case that the gas from the single well at issue was not marketable because it was not capable of entering the gathering line where it was sold.  *Id.* at 70–71.  There is no such admissible evidence in this case, and even if there was, it would violate the rule announced in *Fawcett* to hold that GDCTP services are required before gas can be marketable.  Likewise, the Oklahoma federal district court's decision in *Burlington Resources Oil & Gas LP v. U.S. Department of Interior* carries little weight with this Court, as it does not apply Kansas law.  No. 13-cv-0678-CVE-TLW, 2014 WL 3721210 (N.D. Okla. July 24, 2014).

[112]*Fawcett*, 352 P.3d at 1034.  Plaintiff argues that even if these are considered true sales, because the same gas could have been sold at the "actual market" for the highest and best price for the mutual benefit using a gathering and processing agreement, rather than a sales agreement, the contracts violate the "mutual benefit rule."  Plaintiff cites *Fawcett*'s recitation of the ordinary prudence rule, which this Court has already explained would apply if Plaintiff had objected to the price received from AESC and DCP, which it does not.  Under that standard, the best possible price would mean "best prices obtainable at the place where the gas was produced."  *See Roderick*, 2016 WL 4039641, at *6 (quoting *Smith*, 31 P.3d at 258).  Roco has made no showing in this case that DCP failed to obtain the best possible price that could be obtained at the points of sale at issue in this case.

wellhead or in the field, in exchange for a percentage of the proceeds from the sale of casinghead gas, or natural gas and NGLs recovered from the raw gas, less an amount used for processing, such as for gathering and compression.  Title transferred to these third parties at a designated delivery point.  Given this uncontroverted evidence, the Court cannot find a genuine issue of material fact exists about whether the gas purchase agreements between these parties were executed in good faith.

### 3. Duty of Good Faith and Fair Dealing Owed to Roco

In addition to challenging the good faith of the transactions between EOG and the third-party purchasers under the marketable condition rule, Roco argues that EOG breached the implied duty of good faith and fair dealing it owes to Roco under the lease by entering into the third-party purchase agreements in this case.  In *Fawcett*, the court acknowledged that under its formulation of the marketable condition rule, there is potential for "mischief given an operator's unilateral control over production and marketing decisions."[113]  The court stated that the royalty owners' interests were adequately protected by the operator's implied covenant of good faith and fair dealing and implied duty to market.  Because the lessors in *Fawcett* did not challenge whether the duty of good faith and fair dealing was met, the court did "not dwell further on what this might entail."[114]

Under Kansas law,

Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. . . .  [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying

---

[113]*Fawcett*, 352 P.3d at 1042.

[114]*Id.*  The Kansas Supreme Court remanded the case back to the district court after reversing the court of appeals on the implied duty of marketability issue.  *Id.*  On remand, the trial court granted summary judgment on the remaining issue of good faith and denied the class plaintiffs' motion to amend the complaint.  Doc. 128, Exs. G4–G5.

out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.  However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.[115]

This requires a case-specific inquiry.  The Court does not read *Fawcett* as creating a new rule or duty involving good faith and fair dealing between a lessor and lessee.  Instead, the preexisting duty of good faith and fair dealing was sufficient in the court's mind, along with the implied duty of marketability, to protect royalty owners from an operator's bad faith conduct in making production and marketing decisions.  This Court does not read *Fawcett* as contemplating a result whereby a plaintiff only must demonstrate that an operator sells gas to a third-party purchaser before the gas reaches the interstate pipeline to create a triable issue on the duty of good faith and fair dealing, despite fulfilling the marketable condition rule.  Roco must demonstrate some evidence specific to these parties to create a genuine issue of material fact on the implied duty.  Because all of Roco's good faith and fair dealing arguments assert a generalized grievance about these third-party contractual arrangements, summary judgment is appropriate in favor of EOG.  Nonetheless, the Court addresses Roco's specific arguments below.

First, Roco argues that it was entitled to "the fruits of the lease," which include all valuable minerals that came out of the ground at the well, free and clear of all costs.  Roco argues that it did not receive proceeds for drip condensate and helium.  It argues further that the "fruits of the lease" doctrine prohibits reducing the royalty payments based on proceeds that do not deduct post-sale processing costs.  The duty of good faith and fair dealing cannot supply new

---

[115]*Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013) (quoting *Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987)).

contract terms to a contract.; it grows out of the existing terms.[116]  The lease requires that a royalty be paid for "gross proceeds" of gas "sold or used," with no deductions for post production costs "from the well to the point of sale."  According to Harmon's affidavit, EOG paid royalties on the minerals for which it received proceeds, which is what the lease calls for. There is no evidence in the record that EOG took deductions from the gross proceeds it received from either AESC or DCP.  And there is no admissible evidence in the record that Roco was denied royalty for drip condensate and helium.

Second, Roco argues that EOG failed to inform the royalty owners that they were liable for midstream service costs under these purchasing agreements, in breach of the duty of good faith and fair dealing.  In support of this argument, Roco cites *Bank of America v. Narula*, a commercial mortgage foreclosure case where a lender was found in breach of the duty of good faith and fair dealing on a loan agreement, and in breach of its fiduciary duty to the borrowers, where the bank failed to advise and inform the borrowers that they would be personally responsible for certain fees.[117]  The Court does not find *Narula* controlling or helpful on the question of good faith on these facts.  First, *Narula* was an appeal from a district court's findings of fact and conclusions of law after a bench trial.  It merely determined that substantial competent evidence supported the trial court's finding that the bank breached its implied duty in three different ways.[118]  Second, the subjective dishonesty and intentional deception involved in the loan modification agreement at issue in *Narula* was between the signatories to that agreement—whether the bank had disclosed details about the loan agreement to the borrowers, or instead actively concealed information about the agreement that would have caused the

---

[116]*Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1244 (D. Kan. 2006) (quoting *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1243 (D. Kan. 2003)).

[117]261 P.3d 898, 917 (Kan. Ct. App. 2011).

[118]*Id.*

borrowers not to sign the agreement.[119]  Here, there is no allegation that EOG deceived Roco

during the course of executing their lease agreement.  And even if *Narula* did have some

application to the lease in this case, there is no evidence that EOG hid from Roco midstream

services for which it would become "personally liable" to AESC or DCP.  Roco points to no

obligation under the terms of the lease, or under the law, that would require EOG to reveal or

discuss the details of its third-party purchase agreements with the royalty owners under the

circumstances of this case.

Finally, Roco argues that EOG structured its gas contracts to recapture the foregone

opportunity of an express deduction lease in order to pass midstream service costs onto royalty

owners, even though the leases do not clearly and expressly authorize deductions of these

costs.[120]  Again, Roco argues that EOG and the third-party purchasers created sham title transfer

agreements in order to hide costs and take deductions that they would not otherwise be able to

take under a gathering agreement.  The Court is not persuaded that this "foregone opportunity"

theory has been embraced by Kansas good faith law.  Again, under this Court's reading of

*Fawcett*, it was not improper as a matter of law for EOG to calculate and pay royalties based on

the actual gross proceeds received from wellhead and field sales instead of downstream index

prices, so long as any incorporated costs were incurred post-sale.  And as already discussed, the

Court will not impose a heightened duty upon a lessee to calculate proceeds differently than what

is called for under the terms of the contract.

In sum, EOG has demonstrated an absence of evidence that the third-party purchase

agreements in this case violated either the implied duty of marketability or the implied duty of

---

[119]*Id.*

[120]Roco cites to two law review articles in support of this argument: Steven J. Burton*, Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 373 (1980); and Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 Duke L.J. 879, 893 n.11 (Nov. 1988).

good faith and fair dealing.  Roco has failed to come forward with evidence that would be admissible at trial that would create a genuine issue of material fact as to these issues. Summary judgment is therefore granted to EOG on the marketable condition claim.

### B.      Conservation Fee Claim

The Fourth Amended Class Action Complaint, filed February 8, 2016, after EOG's motion for summary judgment was filed, alleged for the first time that the Conservation Fee had been wrongfully deducted from Kansas royalty owners' payments:

> As to the Kansas portion of the class only, Defendant for years improperly deducted or allowed reduction of royalty payments for a royalty owner share of the Kansas Conservation Fee which by law is imposed only on operators, not royalty owners.  Defendant kept the money and never has repaid it, with interest, in accordance with the law.[121]

EOG does not dispute that the conservation fees were wrongfully deducted from these royalty payments between April 2006 and April 2011.[122]

On March 7, 2016, before Roco had responded to the summary judgment motion, EOG issued a reimbursement check to Roco for all prior conservation fee deductions taken from Roco's royalty from first production in April 2006 to March 2011, the last production month for which EOG deducted conservation fees.  EOG sent a check to Roco in the amount of $676.12 on March 11, 2016, representing conservation fees deducted from royalty payments in the amount of $384.70, plus 10% interest in the amount of $291.42.  Roco has not cashed the check.

In the reply memorandum, EOG argues that its payment of the conservation fee plus interest to Roco, the named plaintiff, renders this claim constitutionally moot.[123]  Article III of

---

[121]Doc. 98 at 10 ¶ 20e.

[122]*See Hockett v. Trees Oil Co.*, 251 P.3d 65, 71 (Kan. 2011).

[123]Roco argues that EOG waived this argument by not raising it in the original motion, or by not filing a separate motion for summary judgment after Roco had been allowed leave to amend.  The Court disagrees. Mootness is jurisdictional and can be raised at any time.  *See, e.g.*, *Colo. Off Highway Vehicle Coal. v. U.S. Forest*

the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and

"Controversies."  As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action.[124]

The standing doctrine requires federal courts, before considering the merits of an action, to

"satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the

controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction."[125]  Standing

considers whether there is a case or controversy at the time the action is filed, while "mootness

ensures it remains one at the time a court renders a decision."[126]  "Failure to satisfy the

requirements of either doctrine places a dispute outside the reach of the federal courts."[127]

Even though Roco had standing to assert a conservation fee claim at the time the Fourth

Amended Complaint was filed, "[a]n 'actual controversy must be extant at all stages of review,

not merely at the time the complaint is filed.'"[128]  "If an intervening circumstance deprives the

plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the

action can no longer proceed and must be dismissed as moot."[129]

---

*Serv.*, 357 F.3d 1130, 1133 (10th Cir. 2004).  Both parties were allowed an extra brief to address the issue, so there is no prejudice associated with it being raised for the first time in the reply.

[124]*Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[125]*Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[126]*Brown v. Buhman*, 822 F.3d 1151, 1163–64 (10th Cir. 2016).

[127]*Id.* at 1164.

[128]*Id.* at 1165.

[129]*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016).

Roco argues that the Conservation Fee claim is not moot despite EOG's offer to refund those charges, because the royalty owners were not provided with a refund, and because Roco has not accepted Roco's settlement offer.  The Court agrees.

The Tenth Circuit has discussed the mootness inquiry in the class action context as follows:

> [T]he Supreme Court has applied the mootness doctrine less strictly in the class action context.  In light of the relative independence of the class entity from any one party, the Court has recognized the more "flexible character of the Art. III mootness doctrine" in the class action context.  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980).  Thus, because a certified class becomes an independent juridical entity capable of satisfying the standing requirements of Article III, the mooting of a named plaintiff's claims after class certification does not moot the claims of the class.  *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 755–56, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976); *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975).  And also, if the named plaintiff's claim becomes moot during the pendency of an appeal challenging the district court's denial of class certification, the appellate court is not divested of jurisdiction.  *Geraghty*, 445 U.S. at 404 & n.11, 100 S. Ct. 1202.  Nor is an appellate court divested of jurisdiction if a defendant offers full settlement of the named plaintiffs' claims, over their objections, after the district court denies class certification.  *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S. Ct. 1166, 63 L. Ed. 2d 427 (1980).
>
> The Supreme Court has also suggested two situations in which a class may be certified despite the mooting of the named plaintiff's claim prior to the district court's certification decision: (1) when the plaintiff's claim is "'capable of repetition, yet evading review,'" and (2) when the plaintiff's claim is "inherently transitory [such] that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Geraghty*, 445 U.S. at 398–400, 100 S. Ct. 1202 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)).  We have previously applied the "capable of repetition, yet evading review" exception to mootness in the class action context, permitting a class action to proceed despite the potential mootness of the named plaintiffs' claims in a case involving conditions at a school for juvenile boys.  *See Milonas v. Williams*, 691 F.2d 931, 937–38 (10th Cir. 1982).[130]

---

[130]*Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138–39 (10th Cir. 2009).

Another potential mootness exception may apply where a defendant "picks off" the named plaintiff before a class action can be certified.[131]

The Court finds that the conservation fee claim is not moot.  First, this appears to be a case where the "picking off" exception to mootness applies.  Some courts have allowed class claims to relate back where a defendant has the ability to "pick off" successive plaintiffs' claims by tendering to each named plaintiff their damages and thereby preventing any plaintiff from obtaining a decision on class certification.[132]  This exception applies where a class certification motion is filed and diligently pursued at the time the named plaintiff's claim becomes moot.[133] Here, Roco opposed any attempts by Defendant to stay the class certification stage of this proceeding in favor of resolving the underlying summary judgment motion.  Roco filed its motion for class certification in January, after summary judgment was filed.  Although briefing has been stayed on that motion pending a summary judgment ruling, the Court can easily find that Roco has filed and diligently pursued a motion for class certification.  EOG has been on notice that the conservation fee claims are brought on behalf of a putative class of plaintiffs with ownership interests in EOG-operated wells.

Moreover, the Court finds EOG's attempt to pay Roco's conservation fees plus interest is analogous to an unaccepted offer of judgment.  The Supreme Court has recently held that an unaccepted offer of judgment in this context is insufficient to moot out a plaintiff's claim.[134] Although the check tendered to Roco for conservation fees is not an offer of judgment, the Court

---

[131]*See, e.g.*, *Wilson v. Gordon*, 822 F.3d 923, 947 (6th Cir. 2016); *Fontenot v. McCraw*, 777 F.3d 741, 747–51 (7th Cir. 2015); *Lucero v. Bureau of Collection Recovery*, 639 F.3d 1239, 1250 (10th Cir. 2011).

[132]*See, e.g.*, *Fontenot*, 777 F.3d at 750 (discussing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1051 (5th Cir.1981)).

[133]*See Brunet v. City of Columbus*, 1 F.3d 390, 400 (6th Cir. 1993) (collecting cases); *see also Fontenot*, 777 F.3d at 750.

[134]*Campbell-Ewald v. Gomez*, 136 S. Ct. 663, 669–70 (2016).

finds that the same rationale applies.  In *Campbell-Ewald v. Gomez*, the Court considered "basic principles of contract law" in concluding that without acceptance, "Campbell's settlement offer remained only a proposal, binding neither Campbell nor Gomez. . . .  [W]ith no settlement offer still operative, the parties remained adverse; both retained the same stake in the litigation they had at the outset."[135]  Like the unaccepted offer of judgment in *Campbell-Ewald*, a defendant cannot unilaterally moot a plaintiff's case through an unaccepted settlement offer.  "[A] would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted."[136]  Thus, the Court denies EOG's motion for summary judgment on the breach of lease claim as to the conservation fee component of that claim only.

## VII.  Conclusion

The Court agrees with EOG that the *Fawcett* decision controls disposition of the Kansas breach of lease claim in this matter, with the exception of the conservation fee component of that claim.  Roco attempts to avoid the result of *Fawcett* by repackaging its implied duty of marketability argument as a breach of the duty of good faith and fair dealing.  But *Fawcett* addresses the issues raised by Roco, regardless of the label.  As in *Fawcett*, the gas here was sold and marketed at the well, or midstream in the field, and the quality of the gas does not dictate a finding that it was not in a marketable condition.  Therefore, in order to satisfy the marketable condition rule and allow for midstream costs to be shared with the royalty owners, the gas was required to be acceptable to AESC and DCP, the third-party purchasers, at the time of delivery, and the third-party purchase agreements must have been good faith transactions.  EOG satisfied its summary judgment burden of showing an absence of evidence that the gas was either not acceptable to these third-party purchasers, or that the purchase agreements were not good faith

---

[135]*Id.* at 671.

[136]*Id.* at 672.

transactions.  Roco has not come forward with specific evidence to show that these particular transactions do not meet the standards set forth in *Fawcett*, and this Court declines to make a generalized finding that the sales arrangements at issue in this case, which were also at issue in *Fawcett*, constitute sham sales designed to circumvent the marketable condition rule.

Moreover, Roco has not come forward with evidence that EOG breached the duty of good faith and fair dealing implied in the lease.  Roco has failed to point to an existing provision in the lease that required EOG to pay royalty on proceeds minus post-sale expenses incurred by third party purchasers to add further value to the gas before it entered the interstate pipeline.  Moreover, there is no specific evidence in the record about the third-party transactions in this case that suggest EOG breached the good faith and fair dealing duty it owed Roco when they were executed.  As such, summary judgment is granted in favor of EOG on the marketable condition rule claim.

Finally, the Court finds that the conservation fee claim is not moot, as urged by EOG.  Although EOG has offered to pay the conservation fee claims wrongfully deducted from Roco's royalty payments between 2006 and 2011, the check delivered to Roco has not been cashed, nor a settlement offer otherwise accepted.  Under these circumstances, controlling law dictates that Roco's conservation fee claim is not moot.  That component of the breach of lease claim survives summary judgment, so the Court likewise denies EOG's motion to dismiss all Kansas claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment as to Roco and Motion to Dismiss All Kansas Claims (Doc. 69) is **granted in part and denied in part**.  The motion is denied as to the conservation fee claim and is otherwise granted on the Kansas breach of lease claim.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiff's Motion to Strike Most of the Declaration of Alan Bates as Improper Opinion and Conclusory Testimony (Doc. 131), and Motion to Strike Most of the Declaration of Michael Cobb of DCP Midstream as Improper Opinion and Conclusory Testimony (Doc. 132) are **denied**.

**IT IS SO ORDERED.**

Dated: November 9, 2016

                                                S/ Julie A. Robinson
                                                JULIE A. ROBINSON
                                                UNITED STATES DISTRICT JUDGE